# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEFF J. HOFFMAN,

        **Plaintiff,**

    v.

**PAPER CONVERTING MACHINE CO.** and
**BARRY-WEHMILLER COMPANIES, INC.,**
        **Defendants.**

:
:
:
:
:
:
:
:
:
:
:

**CIVIL ACTION**

**NO. 08-3012**

FILED

MAR 0 3 2010

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## MEMORANDUM

**Tucker, J.**                                                                                    March **3**, 2010

      Presently before this Court are Defendants' Motion for Summary Judgment (Doc. 31), Plaintiff's

Response (Doc. 51), Defendants' Reply and Supplemental Reply thereto (Doc. 68 and Doc. 72), and

Plaintiff's Sur-Reply (Doc. 79). For the reasons stated below, the Court will grant in part and deny in

part Defendants' Motion.

## FACTUAL BACKGROUND

      Plaintiff Jeff J. Hoffman ("Plaintiff") brings this action to recover damages for an injury

incurred when the fingers of his right hand were drawn into the unguarded in-running nip point between

the anilox roll and the plate roll of an eight-deck flexographic printing press designed and manufactured

by Defendant Paper Converting Machine Co. Plaintiff Jeff J. Hoffman was an employee of Superpac,

Inc. ("Superpac"), the owner of the machine at the time of the incident. *See* Compl. ¶¶ 8, 9, 13. Paper

Converting Machine Co. is in the business of designing, manufacturing, marketing, and selling printing

press machines including the machine at issue in this suit. Compl. ¶¶ 6, 13. Defendant Barry-Wehmiller

Co., Inc. ("Barry-Wehmiller") acquired Paper Converting Machine Co. in October 2005 (hereinafter,

Defendants collectively "PCMC"). Answer ¶ 4. The machine in question was a Model 7223, Serial

Number C1-11P printing press which is an eight-color flexographic press manufactured by PCMC and delivered to Superpac, sometime between 1987 and 1991. Dep. of Andrew Weir at 30.

While operating the press on November 27, 2007, Plaintiff's right hand became entrapped and entangled in the press at an unguarded in-running nip point between the anilox roll and the plate roll. Pl.'s Dep. at 18-19, 23, 24; Compl. ¶ 9. Although Plaintiff has no recollection of the events leading up to the incident or how his hand was drawn into the rolls, a post-accident investigation by Superpac revealed that Plaintiff was attempting to clean a high mark[1] on the press while it was still running by sliding his plastic employee time card into the rollers of the machine.[2] Dep. of Andrew Weir at 23-24; Pl.'s Dep. at 65 (noting he has no memory of the incident). Once Plaintiffs' hand was drawn into the machine, he could not reach any "turn-off" switch and had to be extracted by a coworker. Compl. ¶¶ 10, 15.

As a result of the entrapment, Plaintiff suffered amputation of four fingers on his right hand as well as other injuries to his bones, tissue, and other parts of his body, together with emotional injuries. *Id.* ¶ 11. Immediately following the accident, Plaintiff was taken to Abington Memorial Hospital and transferred by helicopter to Thomas Jefferson University Hospital ("Jefferson"). Plaintiff underwent multiple surgeries along with physical therapy, and has since been diagnosed with post-traumatic stress disorder. Plaintiff is currently employed by Superpac in an accommodated capacity as a rewinder with limited responsibilities and a decrease in pay. Pl.'s Dep. at 75-76; Dep. of William Seitzinger at 40, 42.

Plaintiff alleges that the printing press at issue is defective as designed because: (1) it did not contain a guard that would have prevented Plaintiff's hand from becoming entrapped in the machine; Compl. ¶ 14; and (2) Defendants failed to properly and adequately warn users of the dangerous condition of the press, Compl. ¶ 18.

---

[1] A high mark is a piece of debris, typically ink, that is attached to the roll. The debris creates a blemish on the printed ribbon as it passes through the station. *See* Pocznyk Rep.

[2] In Plaintiff's opposition brief, Plaintiff notes that Superpac employee William Weng "believes he was told that [Plaintiff's] time card was found in the drip pan [of the machine] after the incident" and that formed the basis for Superpac's conclusions. Pl.'s Opp. at 5 n.2. Whether plaintiff was in fact cleaning a high mark is irrelevant to the Court's decision today.

In response, Defendants argue the press had all the safety features technologically feasible at the time the machine was sold to Superpac. Defendants allege that a guard was tested on the printing presses but that those tests showed the available guard caused damage to the machine. Moreover, Defendants contend that warnings were provided to Superpac and that Plaintiff was made aware of the content of those warnings.

On December 16, 2009, Defendants filed a motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

## **LEGAL STANDARD**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). *See Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 501 (3d Cir. 2008). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson*, 477 U.S. at 248; *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 327 (1986). Thus, the moving party bears the initial responsibility of identifying the portions of the record "which it believes demonstrates the absence of a genuine issue of material fact." *El v. SEPTA*, 479 F.3d 232, 237 (3d Cir. 2007). Yet, even if the moving party fulfills this requirement, "the non-moving party can defeat summary judgment if it nonetheless

produces or points to evidence in the record that creates a genuine issue of material fact." *Id.* at 238

(citing *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir.1993)).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S.

372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Under Rule 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and

may not rest upon the mere allegations or denials of its pleadings. *See Martin v. Godwin*, 499 F.3d 290,

295 (3d Cir. 2007). At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See*

*Anderson*, 477 U.S. at 249; *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).

In doing so, the court must construe the facts and inferences in the light most favorable to the non-

moving party. *See Matsushita*, 475 U.S. at 600-01; *Horsehead Indus., Inc. v. Paramount*

*Communications, Inc.*, 258 F.3d 132 (3d Cir. 2001). The court must award summary judgment on all

claims unless the non-moving party shows through affidavits or admissible evidence that an issue of

material fact remains. *See, e.g., Love v. Rancocas Hosp.*, 270 F. Supp. 2d 576, 579 (D.N.J. 2003); *Koch*

*Materials Co. v. Shore Slurry Seal, Inc.*, 205 F. Supp. 2d 324, 330 (D.N.J. 2002).


## DISCUSSION

Prior to addressing the specific issues raised by the parties in this matter, the Court must first

address whether the relevant standard for products liability law is expressed in the Restatement (Second)

of Torts or the Restatement (Third) of Torts. The confusion arises from the decision in *Berrier v.*

*Simplicity Mfg.*, 563 F.3d 38 (3d Cir. 2009). In *Berrier*, the United States Court of Appeals for the Third

Circuit predicted that Pennsylvania would adopt the Restatement (Third) of Torts, *see id.* at 54. Yet, the

Pennsylvania Supreme Court case on which the Third Circuit based its prediction was dismissed as

improvidently granted, *see Bugosh v. I.U. North Am., Inc.*, 942 A.2d 897 (Pa. 2008), *dismissed as improvidently granted* 971 A.2d 1228 (Pa. 2009), meaning that the Pennsylvania Supreme Court never reached the merits of the case. Plaintiff now urges that the *Berrier* decision is not binding precedent, and that the Court must therefore apply the Restatement (Second) of Torts, while Defendants argue that the Restatement (Third) of Torts applies because a district court is bound by Third Circuit precedent on state law issues unless a subsequent decision by the highest state court diverges from Third Circuit precedent. *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 547 (E.D. Pa. 2006).

The parties emphasize the significance of this issue because the Restatement (Second) and Restatement (Third) set forth two different standards for evaluating whether a design defect exists in a products liability case. The Restatement (Second) Products Liability § 402A provides that a product is defective in design where it leaves the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use. In contrast, the Restatement (Third) of Torts: Products Liability, § 2(b) states in pertinent part that a product is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

Essentially, while one standard focuses on an intended user making an intended use of the product, the other focuses on the foreseeable risks of harm and whether an alternative design could have minimized or eliminated that risk. Consequently, the parties argue that the substantive differences between the two standards will have a significant impact on the admissibility of evidence and ultimately, the outcome of this action.

The Court notes that there is a divergence among district courts regarding whether the Restatement (Second) or Restatement (Third) should apply, and finds that because the Pennsylvania

Supreme Court decision in *Bugosh* was merely a procedural dismissal of the matter, the absence of a substantive decision renders the Third Circuit's decision in *Berrier* binding precedent. As such, the Restatement (Third) applies. *See Richetta v. Stanley*, 2009 WL 2707549 (E.D. Pa. Aug. 25, 2009); *See also Martinez v. Skirmish, U.S.A., Inc.*, 2009 WL 1437624 (E.D. Pa. May 21, 2009).

We will now address Defendants' Motion for summary judgment with respect to each count of Plaintiff's complaint in turn.

## Count II - Strict Liability

Plaintiff asserts that Defendants are strictly liable under the Restatement (Third) for the flexographic press specifically, because the necessary technology to guard against the particular hazard that allegedly caused Plaintiff's injury was available when the press was designed, and because Plaintiff alleges that Defendants failed to provide adequate warnings. In support of this position, Plaintiff offers various expert reports which claim that the technology was available, and further, deposition testimony which gives rise to an inference that Defendants' own engineers purposefully sabotaged designs which included the guarding that Plaintiff alleges was feasible. In response, Defendants maintain their argument that there was no safer, feasible alternative design available during the relevant time period, and that adequate warnings were provided, which if heeded, functioned to prevent an injury. Defendants also offer expert testimony to support the same.

To prevail on a claim for strict liability, a plaintiff must prove (1) that the product was defective when sold, and (2) that the product defect was a substantial factor in causing the injury. *Foley v. Clark Equip. Co.*, 525 A.2d 379 (Pa. Super. 1987). The Restatement (Third) further provides that a product:

> (b)  is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;

(c)      is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instruction or warnings renders the product not reasonably safe.

## A.      Design Defect

In general, the plaintiff must establish a prima facie case of defective design by proving the availability of a reasonable alternative.  Restatement (Third) of Torts: Products Liability, § 2, cmt. b.  To establish a prima facie case, a plaintiff need not produce a prototype which presents a reasonable alternative design, but instead may rely on qualified expert testimony that a reasonable alternative could have been practically adopted at the time of sale, even where the expert has not produced a prototype. *Id.*, cmt. f.  "If the plaintiff introduces expert testimony to establish that a reasonable alternative design could have been practically adopted, a trier of fact may conclude that the product was defective, notwithstanding that such a design was not adopted by any manufacturer, or even considered for commercial use, at the time of sale." *Id.*, cmt. d.

Here, while Plaintiff has not produced a prototype or provided the specifications of an identical or substantially similar press which incorporates a reasonable alternative design,[3] Plaintiff has produced experts who indicate that all of the necessary technology existed at the time that the flexographic press in question was designed to allow nip point guards and interlocked barrier guards to be included on the press.  Plaintiffs' experts also submit that the costs of incorporating guards was less than two percent (2%) of the purchase price for the press.  Not surprisingly, Defendants counter with experts who allege the exact opposite, stating that there was no safer alternative available during the relevant time period. Review of the record in this matter reveals that there is a clear dispute as to whether a reasonable

---

[3] Plaintiff's experts reference guarding on a six-color flexographic press, and reason that if guarding was feasible on a six-color press, it should have been feasible for the eight-color press on which Plaintiff was injured also.  However, the details provided on the six-color press are limited, such that the available evidence is insufficient to determine whether the presses are substantially similar for purposes of including guarding on the eight-color flexographic presss design.

alternative design could have been practically adopted during the relevant time period, the central question in assessing whether the press was defective in design for purposes of the Restatement (Third).

As a result, this dispute will be determined largely on the basis of expert credibility, and it is well established that in evaluating a motion for summary judgment "the court must neither resolve factual disputes nor make judgments of credibility; instead, all inferences should be drawn in the light most favorable to the non-moving party." *Van Doren v. Coe Press Equipment Corp.*, 592 F. Supp. 2d (E.D. Pa. 2008) (citing *Peloro v. U.S.*, 488 F.3d 163, 173 (3d. Cir. 2007). "[A]t the summary judgment stage, the court is not entitled to weigh the evidence; that is solely the task of the fact-finder. Rather, the court must limit its inquiry to whether a genuine issue of fact exists." *Berrier*, 563 F.3d at 64 n. 39.    Given that there is a genuine issue of material fact regarding whether a reasonable alternative design was feasible at the time that the press was sold to Plaintiff's employer, and that the resolution of this issue which will undoubtedly affect the outcome of the case, Defendants' motion for summary judgment cannot prevail with respect to Plaintiff's strict liability claim for design defect.

### B.    Failure to Warn

Commercial product sellers must provide reasonable instructions and warnings about risks of injury posed by products. Restatement (Third) of Torts: Products Liability, § 2, cmt. i. The Restatement (Third) adopts a reasonableness test for judging the adequacy of product instructions and warnings. *Id.* It further provides that product warnings can rarely communicate all potentially relevant information, and the ability of a plaintiff to imagine a hypothetical better warning in the aftermath of an accident does not establish that the warning actually accompanying the product was inadequate.

Defendants correctly acknowledge that warnings are not a substitute for the provision of a reasonably safe design, *Id.* at cmt. l, but contend that the press contained several warnings which indicated the potential hazards associated with misuse of the press, along with instructions not to clean or

work near the press while it was operational.  Plaintiff argues that Defendants warnings are inadequate, and that even if adequate, cannot serve to convert a defectively designed product into a safe one. Although Plaintiff is correct in principle, he has failed to do more than make a conclusory argument that the warnings are inadequate.

The Restatement (Third) explicitly states that it is impossible to identify anything approaching a perfect level of detail that should be communicated in product disclosures.  *Id.* at cmt. i.  However, it also states that there are measures that can be taken to make a warning more effective, such as the inclusion of the full spectrum of product risks for experienced product users such as Plaintiff, or more vivid and unambiguous warnings.

In the present case, Plaintiff merely states that the warnings are inadequate, and at no point suggests through experts or otherwise why the warnings are allegedly inadequate or how the existing warnings could be improved.  Indeed, Plaintiff goes so far as to misleadingly state that Defendants "did not... put any warnings on the press," Pl. Opp. at 25, when in fact, the record is replete with testimony and photographs establishing the presence of warnings on the press.  Plaintiff's misleading statement and conclusory allegations of inadequate warnings are simply insufficient to defeat a motion for summary judgment with respect to this claim.  "A non-moving party may not rely solely on mere pleadings or allegations to identify unresolved genuine issues of material fact." *El v. SEPTA*, 479 F.3d 232, 237 (3d Cir. 2007).  Consequently, with respect to Plaintiff's strict liability claim for failure to warn, Defendants motion for summary judgment is granted.


**Count I - Negligence**

Plaintiff's complaint first alleges that Defendants negligently designed the flexographic press in question by failing to include nip-point guarding along with interlocked barrier guarding, and additionally, that Defendants were negligent by failing to provide adequate warnings and instructions

regarding the hazards. Relying on *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1003 (Pa. 2003), Defendants claim that the trial court in *Phillips* granted the defendants' motion for summary judgment on the negligent design-defect claim, holding that when a product is found not defective for strict liability purposes, a negligent design-defect claim must also fail. Defendants state, without explanation, that they "owed a duty to Plaintiff as a user of the printing press to manufacture and design a safe product," Defs. Mot. at 15, and that in order to show a breach of the duty to exercise due care, Plaintiff must present evidence that Defendants' design deviated from an accepted standard of care. Based on the trial court's holding, Defendants essentially reason that since the technology to place guarding in the relevant locations on the press was allegedly unavailable when the press was sold, which would preclude liability under a theory of strict liability, that the same applies to preclude liability under theories of negligence. In response, Plaintiff's opposition is virtually an argument that since Defendants are allegedly not entitled to summary judgment on Plaintiff's strict liability claim for defective design, summary judgment cannot be properly granted on Plaintiff's negligent design claim. Both parties are incorrect and misstate the law of negligence actions in the products liability context.

The Court elected to discuss Plaintiff's negligence claims after the discussion of the strict liability claims in an effort to clear the present confusion.

### A.    Negligent Design and Negligent Manufacturing Claims

While the trial court and Superior Court in *Phillips* did articulate in its holding that the viability of a negligence claim was dependent on that of a strict liability claim, the Pennsylvania Supreme Court addressed this issue and declared that such treatment of negligence claims in a products liability action is flawed. With regard to the appellee's negligence claim, the Supreme Court in *Phillips* stated:

> "Negligence and strict liability are distinct legal theories. Strict liability examines the product itself, and sternly eschews considerations of the reasonableness of the conduct of the manufacturer. In contrast, a negligence cause of action revolves around an examination of the conduct of the defendant. Were we to dispose of a

negligence claim merely by an examination of the product, without inquiring into the reasonableness of the manufacturer's conduct in creating and distributing such a product, we would be divorcing our analysis from the elements of the tort. Thus, as the elements of the cause of action are quite distinct, it would be illogical for us to dispose of Appellee's negligence claim based solely on our disposition of her strict liability claim."

*Id.* at 1008. Therefore, this Court must engage in a proper analysis of Plaintiff's negligence design and manufacturing defect claims under Pennsylvania law.

To prevail in a negligence action, a plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage. *Berrier*, 563 F.3d at 61 (citing *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008 (Pa. 2003). Thus, the first step in an analyzing a negligence action is the determination of whether a defendant has a duty to the plaintiff, and the question of whether a defendant owes a plaintiff a duty of care is a question of law to be answered by the court. *Id.* at 62. Consequently, Defendants' conclusory determination that they owe Plaintiff a duty must be disregarded, and this Court must assess whether, under the law, Defendants in fact owe such a duty.

Answering the question of whether a duty of care is owed is a policy decision that requires the trial court to apply the "*Althaus* test." The *Althaus* test requires the court to consider (1) the relationships between the parties; (2) the social utility of the defendant's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the defendant; and (5) the overall public interest in the proposed solution. *Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166, 1169 (2000). Yet, no one of these five factors is dispositive. Rather, "a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant. *Phillips*, 841 A.2d at 1008-09.

### 1. Relationship Between the Parties

Since Plaintiff was not a purchaser of the subject press, the Court finds that this factor weighs against the existence of a duty to Plaintiff. This finding is consistent with those of the *Phillips* and *Berrier* Courts. Specifically, the *Phillips* Court found that although there was a relationship between the parties' mother/purchaser and the manufacturers of the butane lighter at issue, the relationship between the manufacturers and the children who died was "less certain." *Id.* Similarly, the *Berrier* Court, which ultimately found that strict products liability law does extend to a bystander, found that the relationship between the bystander and the manufacturer was "at best, uncertain," because the bystander did not purchaser the product. *Berrier*, 563 F.3d at 62.

After comparing the facts in the present case to those mentioned above, the Court finds that the relationship between Plaintiff and Defendants is also, "at best, uncertain," such that this factor weighs in favor of Defendants. *Id.*

### 2. Social Utility of Defendants' Conduct

Next, the Court must examine the social utility of an eight-color flexographic press, without nip point guards and interlocked barrier guards, as Defendants designed the press at the time of sale. Flexographic presses have an obvious social utility as a printing method on a wide range of materials using a wide range of inks.

However, this press does not come without hazards, specifically, in-running nip points between two counter rotating rolls, like that of an old style washing machine wringer. Expert Report of Craig Clauser (April 11, 2009) at 3. Plaintiffs experts allege that while the nip points which create the hazard on this machine cannot be eliminated by design change, they can be guarded, and that the elements necessary for such guarding were available when the machine was designed and sold.

Defendants contend that its engineers did not design a working nip point guard until years after the sale of the subject press, which required years of re-designing and testing. Defendants further contend that the guards which Plaintiff alleges would make the machine safer are actually devices that workers using the press could simply reach around, exposing them to the hazard that the guarding exists to prevent. Record evidence also indicates that Defendants' service technicians observed that the guards initially designed for the subject press in 1984 were ineffective, such that customers in the field "had them all off and in a corner. It wasn't something that they were going to use." Dep. of Michael DeRosier at 50-52.

In *Phillips*, the court found that the social utility a butane lighter was clear, but that a device which prevented small children, who lack the discretion and caution of the average adult, from creating a flame would have a great utility. *Phillips*, 841 A.2d at 1010. The *Phillips* Court therefore found that the social utility weighed against the manufacturer.

The district court in *Berrier* concluded that the social utility of a device which could shut off lawn mower blades was negated because it could be easily disabled by the operator due to interference with operation. The Third Circuit found that the district court's reasoning was incorrect because the record evidence indicated that while forty (40) percent of operators disabled this feature on their mower, sixty (60) percent did not, which meant that the device could have a significant impact on reducing the risk of injury from back-over accidents. *Berrier*, 563 F.3d at 63-64.

Unlike the children in *Phillips*, workers such as Plaintiff have the discretion to abide by the warnings not to work near nip points while the press is operational. In addition, the nip point where Plaintiff was injured is guarded by location, meaning that in order to be exposed to this hazard, Plaintiff had to deploy a maintenance platform, attach a ladder, and then climb onto the platform, which would place him over six feet above the ground, in order to reach the location. To be injured by the nip point, he would have to climb onto this platform and reach into the nip point while the machine was

13

operational. Although Plaintiff argues that the hazard could have been reduced with guarding, he does not dispute that the guarding would be readily removable, and that a worker could easily reach around the guard, which would only defeat the primary purpose of the guarding. Moreover, unlike the experts in *Berrier*, the experts here have not provided evidence that despite consumers' tendency of removing the guarding due a decrease in efficiency, that it nonetheless reduced the risk of injury. As a result, the Court finds that this factor weighs against finding that a duty exists.

### 3.    Nature of the Risk and Foreseeability of Harm

The third prong of the duty analysis requires the court to balance the social utility of a design against the extent and foreseeability of the harm that would result in its absence. *Althaus*, 756 A.2d at 1170. "A duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *R.W. v. Manzek*, 888 A.2d 740, 747 (2005).

In *Phillips*, the court found that the evidence established that butane lighters without child safety features created a substantial risk of injury, resulting in one hundred twenty (120) deaths and seven hundred fifty (750) injuries each year. The court also found that it was reasonably foreseeable to the butane lighter manufacturers that their lighters could fall into the hands of small children, who could, without child safety features, start fires that would result in severe injuries.

In *Berrier*, the Third Circuit found that this factor weighed in favor of the plaintiff injured in a lawnmower accident, stating that the serious nature of the injuries that do result must be factored into the equation along with the frequency of occurrence. *Berrier*, 563 F.3d at 67. There, plaintiff's expert testified that one mower per every five to six thousand (5,000 to 6,000) produced was involved in a back-over blade accident at some point, and that more than one hundred (100) hospitalizations occur each year due to back-over blade incidents. The defendant countered with evidence that such accidents were infrequent, but the Third Circuit ultimately found that the severity of the incidents compared to the

infrequency of accidents weighed in favor of plaintiff.

In the present case, Defendants argue forcefully that while accident involving a worker who places his hand directly into an operational machine is foreseeable, or in other words, conceivable, that it is nevertheless not a reasonably foreseeable misuse of the press such that the press creates an unreasonable risk of harm. DeRosier Dep., Ex. C at T69: 4-6. This Court agrees. There is a significant dispute between the parties in this matter regarding whether Plaintiff was misusing the product at the time of the accident in question by attempting to clean a high mark with his time card while the machine was operational. Given the contradictory evidence, it is not this Court's role to make a credibility determination as to which version of the facts is correct. However, this Court can and does consider from the evidence, the undisputable fact that, unless Plaintiff was cleaning the press, which he was trained to place in an "off" position during such tasks, no aspect of the normal course of Plaintiff's work required him to be in the location where he was injured while the machine was operational. This weighs in favor of Defendants and their position that an incident involving a user who intentionally places their hand into an operational press is not reasonably foreseeable.

While the severity of the accidents involving the subject press leans towards the Plaintiff's position, the infrequency of the accidents serves to further underscore Defendants' position. Plaintiff points to less than a dozen accidents involving flexographic presses over a thirteen year period, DeRosier Dep. at 29-39, but provides no evidence on how many accidents occur which involve presses each year, or the context in which these accidents occurred, all of which would impact a determination of the degree of reasonableness of the risk of harm created. Consequently, the Court finds that this factor also weighs against finding a duty.

### 4. Consequences of Imposing a Duty

The fourth factor of the *Althaus* test requires the Court to consider the consequences of imposing

a duty on a manufacturer. Here, while adding the guarding Plaintiff proposes as an alternative design would increase the cost of manufacturing the press, through expert reports, Plaintiff asserts that this cost would have been minuscule. Defendants argue that once guarding was designed in 2004, it would have been far too costly for it to pay to retrofit all existing presses, and as such, it offered consumers retrofitting of their presses for costs only. However, this does not address whether, if in fact guarding for an eight-color flexographic press was feasible when the press was manufactured and sold, the cost would have been an unreasonable burden for Defendants. Also, Defendants do not specifically dispute that the cost for guarding at the time of manufacture would have been minuscule. Rather, Defendants solely allege that such guarding was not technologically feasible.

Given that Defendants do not identify cost as a reason for not providing guarding at the time of manufacture, but instead that the necessary technology was unavailable, this Court finds that cost was not a factor, and that this element weighs in favor of Plaintiff.

### 5. Public Interest

Finally, the Court must consider the public interest in imposing a duty on flexographic press manufacturers to produce presses with nip point guards and interlocked barrier guards. Under the circumstances, the Court finds that certain considerations under the public interest factor weigh in favor of Defendants, while others clearly weigh in favor of Plaintiff, and in favor of finding a duty. On the one hand, the public had a strong interest in flexographic presses as manufactured at that time without the guarding because of their utility in printing on a wide array of materials. By contrast, the public also has a strong interest in minimizing the risk of injury wherever possible, and this would include the use of guarding on the flexographic press, even if Defendants' allegations that such guarding could be regularly removed is correct. Therefore, to some extent, this factor weighs in favor of finding a duty.

6.     **The End Result of the Balancing of *Althaus* Factors**

After viewing the evidence in the light most favorable to the nonmoving party, the Court finds

that three of the five factors weigh against the finding of a duty, and at least one of the remaining factors

somewhat weighs against the finding that Defendants have a duty to Plaintiff.  As a result, the balance of

the factors indicate that Defendants do not have a duty to Plaintiff, and as such the Court must

necessarily conclude that Plaintiff's negligence claims fail as a matter of law.


**Count III - Breach of Warranty**

Plaintiff also alleges that Defendants breached both express and implied warranties.  The Court

will address each in turn.

1.     **Express Warranties**

In the complaint, Plaintiff alleges that Defendants expressly warranted that the subject press was

safe for its intended and foreseeable uses, and that Defendants breached that warranty because the press

is allegedly defective in design.

Express warranties are addressed in 13 Pa.C.S. §2312, which provides as follows:

"Express warranties by the seller are created as follows:

(1)     Any affirmation of fact or promise made by the seller which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2)     Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3)     Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model."

In *Goodman v. PPG Industries, Inc.*, 849 A.2d 1239, 1246 (Pa. Super. 2004), the Pennsylvania Superior Court found that a third party seeking to benefit from an express warranty between a seller and buyer was unable to benefit from the express warranty either directly or indirectly through an intermediary. The *Goodman* Court explained that "express warranties are bargained, "dickered," individualized promises that the goods will perform up to the specific standards set forth in that warranty." The *Goodman* Court further stated that:

> "a manufacturer who is willing to make a specific and ambitious express warranty must be able to retain some measure of control over both the class of people to whom it is willing to extend the warranty, and the precise parameters of the warranty that it will be obliged to honor. Similarly, given that express warranties are based on the notion of offer and acceptance, it would appear incongruous to allow third parties the benefit of an express warranty when no evidence exists that they were aware of the terms of the warranty or the identity of the party issuing the warranty."

Consequently, the *Goodman* Court held that to preserve the unique character of express warranties, third parties may enforce express warranties only under circumstances where an objective fact-finder could reasonably conclude that (1) the party issuing the warranty intends to extend the specific terms of the warranty to the third party (either directly, or through an intermediary), and (2) the third party is aware of the specific terms of the warranty, and the identity of the party issuing the warranty.

In the present case, there is simply an insufficient amount of evidence to present a claim for breach of express warranties to a jury, and therefore, Defendants will prevail on their motion for summary judgment with respect to this claim. Besides a general statement that Defendants warranted to Superpac, Plaintiff's employer, that the press was safe for its intended and foreseeable use, Plaintiff offers no particular statement or promise which was bargained for between the parties and served as a basis for the bargain. Furthermore, Plaintiff presents no evidence that Defendants intended that any express warranties between Defendants and Plaintiff's employer would be extended to the end-users of

the subject press. Plaintiff also fails to demonstrate that Plaintiff himself was aware of the specifics of any such warranty, or even that Defendant was the manufacturer and seller of the press at the time that any express warranties were made. With only insufficient evidence provided, the Court cannot submit Plaintiff's claim for breach of an express warranty to a jury, as no reasonably jury could find for Plaintiff on this issue relying on the evidence provided.

### 2.    Implied Warranties

Next, Plaintiff alleges that Defendants breached the implied warranties of merchantability and fitness for a particular purpose. The purpose of such warranties are to "protect buyers from loss where the goods purchased are below commercial standards or are unfit for the buyer's purpose." *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992). The existence or nonexistence of such warranties in this matter is governed by Pennsylvania statute. An implied warranty of fitness for a particular purpose exists "[w]here the seller at the time of contracting has a reason to know: (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the skill or judgment of the seller to select and or furnish suitable goods." 13 Pa. C.S.A. § 2315. Additionally, The Pennsylvania Commercial Code further provides that an implied warranty of merchantability requires that the product be "fit for the ordinary purposes for which such goods are used." *Petrucelli v. Bohringer and Ratzinger*, 46 F.3d 1298, 1309 (3d Cir. 1995) (citing 13 Pa. C.S.A. § 2314(b)(3)). For purposes of implied warranty claims, Pennsylvania abandoned the "horizontal privity" requirement of contracts allowing Plaintiff to maintain this action notwithstanding the fact he was not the "buyer." *See generally Salvador v. Atlantic Steel Boiler, Co.*, 319 A.2d 903 (Pa. 1974) (extending the exception to horizontal privity found in 13 Pa. C.S.A. § 2318 to employees of the buyer).

In the context of breach of warranty claims, a product "need not be defective as defined under strict products liability in order to not be fit for ordinary purposes." *Hittle v. Scripto-Tokai Corp.*, 166 F.

Supp. 2d 142, 157 (M.D. Pa. 2001). However, a product that is not merchantable or fit for a particular

purpose is one that is defective. *Petrucelli*, 46 F.3d at 1309; *Pappas v. Sony Electronics, Inc.*, 136 F.

Supp. 2d 413, 427 (W.D. Pa. 2000) (quoting *Altronics*, 957 F.2d at 1105). For example, in *Phillips v.*

*Cricket Lighters* (*Phillips II*), 883 A.2d 439 (Pa. 2005), the Pennsylvania Supreme Court narrowly

construed the "ordinary purpose" of cigarette lighters as to "allow an adult user to produce a flame." *Id.*

at 444. In doing so, the court rejected the plaintiff's argument that foreseeable uses such as a child

playing with the lighter, were ordinary under the statute. *See id.* at 444-45.

When a plaintiff relies upon circumstantial evidence that the product is defective for the purposes

of the implied warranty of merchantability, he must do more than merely prove a defect. Plaintiff must

further negate abnormal use and reasonable secondary causes. *See Altronics*, 957 F.2d at 1105; *see also*

*Pappas*, 136 F. Supp. 2d at 427-28 (interpreting *Altronics* to require negation of abnormal use and

reasonable secondary causes regardless whether plaintiff relies on circumstantial or direct evidence);

*Price v. Chevrolet Motors*, 765 A.2d 800, 809 (Pa. Super. Ct. 2000) (requiring plaintiff to negate

abnormal use and reasonable secondary causes if relying on circumstantial evidence).

Here, Plaintiff alleges that Defendants breached implied warranties in selling a machine that

allowed Plaintiff's hand to be drawn into the press rollers causing substantial injury. Plaintiff has offered

no evidence as to what events led to his hand becoming entangled in the rollers. Regardless of whether

Plaintiff was cleaning a highmark off the roller while the machine was operational as Defendants

contend, Plaintiff has not offered direct evidence as to how his hand became entangled. Thus, Plaintiff's

evidence of a defect is circumstantial – namely that a guard in place could have reduced the risk that

Plaintiff's hand could become entangled from foreseeable uses.

While Plaintiff's evidence is sufficient to proceed at this point on the issue of strict liability

regarding design defect, the standard in evaluating a defect in that cause of action considers more than

the "ordinary use" in determining whether a breach of implied warranties occurred under Pennsylvania

law.  The Court notes again the *Phillips II* Court's refusal to consider a child playing with a cigarette lighter to be within the ordinary uses of those lighters negating the breach of implied warranty claim. *Phillips II*, 883 A.2d at 444-45.

Similarly here, the machine was clearly fit for its ordinary purposes as a printing press.  While the machine may not have been fit to have an employee standing on the maintenance platform while the machine was running, such operation of the machine was not ordinary even if it was foreseeable.  Since Plaintiff has failed to offer evidence regarding how his hand was drawn into the machine, and likewise has failed to negate abnormal use or reasonable secondary causes, Plaintiff has not met his burden to succeed with regard to the implied warranty claims.  Therefore, the Court will grant Defendants' motion for summary judgment regarding Plaintiff's claim for breach of implied warranty also.


**Count IV - Punitive Damages**

Lastly, Plaintiff seeks punitive damages for Defendants' conduct leading to this action.  Under Pennsylvania law, punitive damages are appropriately awarded when a defendant's conduct is outrageous due to evil motive or reckless indifference to the rights of others.  *Phillips II*, 883 A.2d at 445.  Punitive damages are an extreme remedy that should be applied sparingly and only in the most exceptional matters.  *Jeanette Paper Co. v. Longview Fibre Co.*, 548 A.2d 319, 327 (Pa. Super. 1988).  Plaintiffs' burden is ultimately to "adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to 'intentional, willful, wanton or reckless conduct....'" *Phillips II*, 883 A.2d at 446 (quoting *SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702, 704 (Pa. 1991)).  Furthermore, "because punitive damages are intended to punish the tortfeasor for outrageous conduct and to deter him and others like him from similar conduct in the future, [t]he state of mind of the actor is vital." *Snead v. SPCA of Pa.*, 929 A.2d 1169, 1184 (Pa. Super. Ct. 2007) (quoting *Hutchinson* ex rel. *Hutchinson v. Luddy*, 896 A.2d 1260, 1265 (Pa. Super. Ct. 2006)); *see also Feld v.*

*Merriam*, 485 A.2d 742, 748 (Pa. 1984).

The *Phillips* court drew a distinction between negligence and punitive damages claims. The damages awarded in negligence actions compensate a plaintiff for real, measurable losses. *Phillips II*, 883 A.2d at 446. In punitive damages cases, the damages are not awarded to compensate the plaintiff for his losses but rather to punish defendant for egregious actions. *Id.* (citing *G.J.D. by G.J.D. v. Johnson*, 713 A.2d 1127, 1129 (Pa. 1998)). Thus, a defendant's mere knowledge of other accidents involving a product is insufficient to support a claim for punitive damages. For example, the *Phillips* court held that the failure to install child resistant protections on the lighters did not subject manufacturers to liability even though the manufacturer weighed financial factors with the risk that children could use the lighters. *Id.*

In the case at bar, Plaintiff has introduced evidence that Defendants knew accidents similar to the one that injured Plaintiff were occurring, however, the record also indicates that Defendants at least tried to eliminate the risks. Although Defendants were ultimately unable to eliminate those risks at the time that the press was sold to Superpac, Plaintiff has not adduced any evidence that Defendants had an improper motive in abandoning efforts to eliminate those risks when Defendants' attempts were unsuccessful. Essentially, Defendants' conduct, as a matter of law, has not risen to the degree required for this extraordinary remedy. As such, Defendants' motion for summary judgment on Plaintiff's claim for punitive damages is granted.

## CONCLUSION

While Plaintiff has set forth four (4) counts in his Complaint alleging negligence, strict liability, breach of warranties, and punitive damages, the evidence of record contains sufficient evidence to establish a genuine issue of material fact with respect to only one claim, namely, the strict liability claim for design defect. As for the remaining claims, Plaintiff has failed to present evidence which

demonstrates that a genuine issue of material fact exists, and therefore, Plaintiff cannot defeat a motion for summary judgment on these issues.

Accordingly, Defendants' motion for summary judgment on Plaintiff's claims for negligence, strict liability - failure to warn, breach of warranties, and punitive damages is granted. However, Defendants' motion for summary judgment on Plaintiff's strict liability claim for design defect is denied.